AO 91 (Rev. 11/11) Criminal Complaint

AUSA Megan Cunniff Church (312) 886-1173; AUSA Bethany Biesenthal

# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF ILLINOIS
### EASTERN DIVISION

**FILED**
2-26-2014
FEB 2 6 2014

THOMAS G. BRUTON
CLERK, U.S. DISTRICT COURT

UNITED STATES OF AMERICA

v.

CURTIS V. THOMPSON, JR.

CASE NUMBER:
**UNDER SEAL**

14 CR 096

MAGISTRATE JUDGE COLE

## CRIMINAL COMPLAINT

I, the complainant in this case, state that the following is true to the best of my knowledge and belief.

From in or about September 2013 through in or about December 2013, at Chicago, in the Northern District of Illinois, Eastern Division, the defendant(s) violated:

| Code Section | Offense Description |
|---|---|
| Title 18, United States Code, Section 666(a)(1)(B) | As an agent of the City of Chicago, a local government receiving in excess of $10,000 under a Federal program, and staff member to Alderman A, defendant herein corruptly solicited, accepted, and agreed to accept things of value, namely $7,500, intending to be influenced and rewarded in connection with any business, transaction, and series of transactions of the City of Chicago involving any thing of value of $5,000 or more, specifically, a letter of support from Alderman A for the sale of alcohol in a business to be established and licensed in Alderman A's ward; |

This criminal complaint is based upon these facts:

 X  Continued on the attached sheet.

RAYMOND B. HART
Special Agent, Federal Bureau of Investigation (FBI)

Sworn to before me and signed in my presence.

Date: February 26, 2014

City and state: Chicago, Illinois

JEFFREY COLE, U.S. Magistrate Judge
*Printed name and Title*

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF ILLINOIS | ss

## AFFIDAVIT

I, RAYMOND B. HART, being duly sworn, state as follows:

## I.    BACKGROUND

1.    I am a Special Agent with the Federal Bureau of Investigation, and have been so employed since 2009. I am currently assigned to a public corruption squad of the FBI, and my responsibilities include the investigation of bribery, mail fraud and wire fraud, among other federal crimes.

2.    This affidavit is submitted in support of a criminal complaint alleging that CURTIS V. THOMPSON, JR., being an agent of the City of Chicago, a local government receiving in excess of $10,000 under a Federal program from January 1, 2013 to December 31, 2013, and as a staff member of Alderman A, corruptly solicited, accepted, and agreed to accept things of value, namely $7,500, intending to be influenced and rewarded in connection with any business, transaction, and series of transactions of the City of Chicago, specifically, a letter of support from Alderman A for the sale of alcohol in a business to be established and licensed in Alderman A's ward, which involved a value of $5,000 or more, in violation of 18 U.S.C. § 666(a)(1)(B).

3.    Because this affidavit is being submitted for the limited purpose of establishing probable cause in support of a criminal complaint charging THOMPSON with federal program bribery, I have not included each and every fact

known to me concerning this investigation. I have set forth only the facts that I believe are necessary to establish probable cause to believe that the defendant committed the offense alleged in the complaint.

4. This affidavit is based on my personal knowledge, information provided to me by other law enforcement agents, and my review of documents, consensual recordings made by Cooperating Witness 1 ("CW1"), and court-authorized interceptions of communications over cellular phones used by Individual A, pursuant to 18 U.S.C. § 2518.

## II. FACTS SUPPORTING PROBABLE CAUSE

### A. The City of Chicago and Thompson

5. According to public records, the City of Chicago ("the City") is a municipal corporation and a municipal subdivision of the State of Illinois. According to the website www.USASpending.gov, the City received more than $10,000 in federal funds in fiscal year 2013.

6. The City's legislative branch is the City Council, which is comprised of approximately fifty aldermen, each of whom represents one legislative district or "ward." Aldermen are compensated and publicly-elected. The City Council has the authority to set policy and pass ordinances and resolutions related to the responsibilities of City government, including approving zoning regulations and business licenses.

7. Aldermen are assisted in their official duties by staff members, including chiefs of staff, who are paid City employees.

8.    It is the practice of aldermen to issue letters to City departments, such as the Department of Business Affairs and Consumer Protection, businesses, and governmental agencies in which the aldermen convey their support or non-support for licenses and permits, such as liquor licenses, that may affect their wards. These letters are typically influential in the license and permit-approval process.

9.    The City requires businesses selling alcoholic liquor at retail to first obtain a city retailer's license ("liquor license"). The City's Commissioner of Business Affairs and Consumer Protection (the "liquor commissioner") decides whether to approve applications for liquor licenses. By ordinance, the liquor commissioner is required to send written notification of the application for the liquor license to the alderman of the ward in which the premises described in the application is located.

10.    According to publicly-available City records, THOMPSON is employed as an assistant to Alderman A. In 2013, THOMPSON was employed as the chief of staff to Alderman A.

**B.    Information from CW1**

11.    CW1 is a property manager for business associates who buy property, renovate the property, and then sell the property for a profit. In March 2013, CW1 pled guilty in United States District Court for the Northern District of Illinois to one count of wire fraud, in violation of 18 U.S.C. § 1343, in connection with a mortgage fraud scheme. CW1 has not yet been sentenced. CW1's criminal history also includes a conviction in Cook County, Illinois for misuse of a credit card, for

which he was sentenced to two years' probation. CW1 began cooperating with the government in March 2008 after being confronted by the FBI with CW1's involvement in the mortgage fraud scheme to which CW1 pleaded guilty. CW1 is cooperating in the hope of receiving leniency with respect to CW1's future sentence.

12.    Since September 2012, the FBI has used CW1 in an on-going investigation. As part of that investigation, CW1 paid Individual A, a licensed expediter with the City of Chicago, $700 in law enforcement funds for Individual A's assistance in filing a false public document. During that investigation, Individual A informed CW1 that Individual A knows the City's liquor commissioner and can obtain a liquor license in any ward of the city. As a ruse and at the direction of law enforcement, CW1 requested Individual A's assistance with obtaining a liquor license for an associate of CW1's. Individual A, and later, Individual B, agreed to help CW1.

13.    As described below, CW1 recorded numerous meetings and phone conversations with Individual A and Individual B in which Individual A and Individual B discussed facilitating a liquor license for CW1's associate in exchange for the payment of bribes to aldermen. Ultimately, Individual A and Individual B directed CW1 to Alderman A's ward. On December 19, 2013, CW1 paid a $7,500 bribe to THOMPSON, Alderman A's chief of staff, in exchange for a letter of support from Alderman A for a liquor license for a convenience store in Alderman A's ward.

### C. Individual A and Individual B Explain the Corrupt Process for Getting the Support of an Alderman for a Liquor License

14.  According to CW1, in December 2012 or January 2013, CW1 and Individual A had an unrecorded, in-person conversation about Individual A's ability to obtain liquor licenses in the City of Chicago. According to CW1, Individual A told CW1 that he (Individual A) knows the City's liquor commissioner and can obtain a liquor license in any ward of the City, including areas that have moratoriums in place that prohibit the issuance of new liquor licenses.

15.  In a consensually-recorded, in-person meeting at Individual A's residence on March 13, 2013 and as a ruse, CW1 told Individual A that CW1's associate wanted to obtain a liquor license from the City of Chicago in the wards of Aldermen B, C, and D. CW1 asked Individual A if he could help with obtaining the liquor licenses. Individual A said he could.

16.  According to CW1 and as captured on the recording, Individual A explained that, among other expenses, it cost $4,400 to obtain a liquor license and $250 to get a business license within the City of Chicago. Individual A added, "You have to kick in five... $7,500.00 for the alderperson." Individual A continued, "$7,500.00 for the alderperson. You gotta kick it in. They run, they run, uh, I want to call them card games, but you would call them political donations." I understand that Individual A was explaining to CW1 that certain aldermen require bribe payments, disguised as campaign contributions, before they will give their support

for a liquor license.[1] Individual A then said he had to call a "guy" (Individual B) to ask about Alderman B.

17.    According to CW1 and as captured on the recording, Individual A told CW1 said that he (Individual A) typically charges "$15,000 to $20,000" to assist with obtaining a liquor license, but he would accept $7,500 for this transaction, "no less." When CW1 asked Individual A if any one alderman was better than the other, Individual A said that Alderman C "might even be $10,000." I understand that Individual A was referring to the amount of the bribe necessary to pay Alderman C in order to obtain a liquor license in Alderman C's ward.

18.    In a consensually-recorded telephone conversation on April 2, 2013, CW1 told Individual A that CW1's associate wanted to open a grocery store that sells liquor. CW1 added that CW1's associate did not want to sign a lease for the property until CW1 got assurances from Individual A that the liquor license would be obtained. Individual A responded by saying, "You got to talk to [Individual B] and I together."

---

[1] At various points in the Affidavit, I will offer my interpretations of certain recorded and intercepted conversations/meetings in brackets and otherwise. My interpretations of these conversations are based on my knowledge of the investigation to date and review of prior interceptions, the contents and context of the conversations, prior and subsequent conversations, conversations with other agents, and my training and experience. Moreover, the voice identifications for the conversations set out below are preliminary. The identification of some individuals involved in these conversations has not yet been completed. Some of these summaries do not include references to all the topics covered during the course of the conversations.

**D.    Individual A and Individual B Direct CW1 to Alderman A's Ward to Obtain a Liquor License**

19.    On August 18, 2013 at approximately 6:56 p.m., Individual B called Individual A.  During the call, Individual B and Individual A discussed obtaining a liquor license for CW1 in Alderman A's ward.  Specifically,

20.    Individual A and Individual B discussed Alderman A's ward. Individual A asked, "How is [Alderman A]?"  Individual B said, "We can work that one."  Individual A said, "Well, his chief of staff [THOMPSON] is my buddy." Individual B said, "Yeah, well, I know his [Alderman A's] father, [Individual C]." Individual A said, "Yeah, I know that.  So we'll be real quick [in obtaining Alderman A's approval for a liquor license].  Individual A said, "[U/I] I know the chief of staff [THOMPSON] for the alderman, and I want to get the liquor license done." Individual B said, "Alright."  Individual A said, "So, I don't know that I'm gonna need too much help on that one."  Individual B said, "Okay."  Individual A said, "That sounds to me like it's a slam dunk."  Individual B said, "Okay."  Individual A then said, "If the chief of staff wants it, if the chief of staff wants it and the alderman's okay, then what else do I need?"  Individual B said, "Okay."  Individual A said, "Right?"  Individual B agreed, "Right."  Individual A then said, "So, now we gotta work on [CW1].  I want to get money from [CW1] this week [referring to payments for their assistance in obtaining a liquor license for CW1]."

21.    On August 21, 2013, at approximately 6:42 p.m., CW1 called Individual B.  In this conversation, Individual B explained to CW1 that he, Individual B, could get CW1 a liquor license in Alderman A's ward.  Specifically,

Individual B said, "I got another one for you in [Alderman A's ward]." CW1 responded, "That's nice. Okay." CW1 asked, "Is that one going to be like, uh, a one, two, three go?" Individual B replied, "Yep." Individual B explained further, "You got to find a place for this liq...You got to find a spot in the [ward]. In fact, they got some over there by Wal-Mart." CW1 then responded, in part, "Okay."

22.     On August 27, 2013, at approximately 9:55 a.m., CW1 called Individual B. During the call, Individual B said that CW1 should pursue a liquor license in Alderman A's ward. Specifically, CW1 said, "Ok, uhm, okay, [...]let's put that [Alderman B] to the side for right now." CW1 later said, "Last time I looked it up, the one that you told me would be quick and easy [to get a liquor license]." Individual B said, "Yeah, that's [Alderman A]."

23.     Individual B then explained the process, stating, "All I need is an address on that [location in Alderman A's ward] and give them [Alderman A or his representatives] a call." CW1 said, "I, I will. Who, who am I going to have to be paying basically? Is [Individual A] gonna necessarily going to be involved that he has no involvement?" Individual B responded, "[Individual A's] always involved. I don't do anything without [Individual A] tellin' us it's okay." CW1 said, "Okay. So I am still going to have to pay [Individual A]. And you know, the ward and all that other stuff. So I am still going to have to pay everybody at this point." Individual B responded, "Well, get that address and then we'll see how it looks before we move any other direction, okay?" CW1 confirmed, "Okay."

24. On September 4, 2013, CW1 met with Individual A and Individual B at a public restaurant. Prior to the meeting, I observed CW1 walking into the restaurant. CW1 was equipped by law enforcement with a concealed recording device during the meeting. As captured by the recording and prior to Individual A arriving to the meeting, CW1 and Individual B discussed CW1's associate obtaining a liquor license in Alderman A's ward.

25. Specifically, CW1 asked, "A one, two, three process?" Individual B answered, "Right. I'm waiting on him [Alderman A's representative] to call me back now." After Individual A arrived at the meeting, CW1 asked, "How much is it going to cost in [U/I] in [the ward]?" Individual A then asked Individual B, "20 grand [$20,000], [Individual B]?" To which CW1 responded, "Now you want to raise the price?" Individual A then said, "Won't you put a $1,000 upfront and put everybody in a nice comfort zone?" Individual A went on to tell CW1 that if CW1 would pay Individual B $1,000 that CW1 could "take it out of the 17,500." Later in the meeting, CW1 again asked about the cost of getting a liquor license in the ward. Individual A answered, "17,000. Yeah." Individual A then reiterated to CW1, "Take it out of the seventeen five [$17,500], give Individual B a thousand [$1,000]."

26. On September 5, 2013, at approximately 11:09 a.m., CW1 called Individual B. In this conversation, CW1 and Individual B discussed payments in exchange for CW1's associate getting a liquor license in Alderman A's ward. Individual B explained that Alderman A had a committee that approved requests for actions like liquor licenses, creating a buffer between the action and the bribe.

9

27.    Specifically, CW1 said, "I just wanted to go over this with my guy [CW1's associate] again and make sure I have everything correct, so we're still doing basically the same thing that we did with [Alderman B]." Individual B responded, "Right." CW1 then attempted to get an accounting for the $17,500. CW1 said, "Basically, 5,000 to you, 5,000 to him [Individual A] and 7,500 for [Alderman B], but instead, now we're leaving that piece for [Alderman A]. Individual B then said, "Well, I don't, we're [Individual B and Individual A] not making any commitments for them [Alderman A and his representatives]. Our thing is just for the liquor license and our [Individual B and Individual A] work [getting the approval for the liquor license]. We can't include them [Alderman A or his representatives] in any of our conversations, in terms of whatever we do, so our whole thing is just to get the liquor license for your, your [U/I] and that's it. We, we won't, we won't[U/I] we won't even talk to him [Alderman A] about anything."

28.    As the call continued, Individual B said, "Once we know what it is ... once we know it's [approval for the liquor license] a go, then we don't have to worry about it. All we want to do is get the letter [letter of support], give you a copy of the letter and take care of the business. That's it. We're not gonna talk directly to him [Alderman A]. All we're gonna do is get a letter from his office saying that it's okay and most of the time, once that happened, there's never, he never, he just give his okay. We never talk to them. We never talk to the alderman." CW1 then said, "Right, right. Okay, but you guys have a way around, I'm sure, through somebody. That's why we're allocating 7,500, I imagine." Individual B confirmed, "Right. Eh,

I'm not sure, but I'm just saying we never talk to the alderman. We usually just talk to the person he, that we're referred to once we get the letter, and once we get that, then we go, we take care of the business. We never talk to the alderman."

29.    As the call continued, Individual B further explained that Alderman A uses a "committee" on his behalf to talk to individuals requesting a liquor license. Individual B said, "He [Alderman A] just doesn't talk. He usually has a committee that we talk to. We never talk to him. The committee's the one we usually talk to. Most of them talk, you know, deal through ... if the committee says it's okay, we don't have a problem. They get us a letter from the committee cause then he [Alderman A] accepts what their recommendation. It's not that we're talking to him. We're talking to his committee. Most of them [Chicago aldermen] set it up that way now where they have a buffer in between who they talk to directly, and who the committee talks to directly, and they make the recommendation to him when they meet with him on those issues." Individual B continued, "There's a committee that we talk to. Once we talk to the committee, they say 'Okay, we're gonna get back to you.' Once they get back, they usually have the letter [letter of support], or they tell us what we have to do next or what he demands, or she demand, and we follow that course. We talk to the committee." CW1 responded, "Got it."

30.    On September 9, 2013, CW1 met with Individual A at Individual A's residence. CW1 was equipped by law enforcement with a concealed recording device during the meeting. As captured by the recording, during the meeting, CW1

asked, "Is there any flexibility on the 7,500 [bribe payment of $7,500] to [Alderman A]?" Individual A then said, "[U/I] 10,000." CW1 responded, "Come on." Individual A replied, "No. There ain't no flexibility on nothing." CW1 then asked Individual A, "Are you really paying 7,500 to this guy [Alderman A]." Individual A responded, "This guy is getting 7,500. That's for sure." CW1 next asked, "How is the 7,500 coming? In cash?" Individual A responded, "Yeah cash."

31.    At the direction of the FBI and in a consensually-recorded conversation, CW1 informed Individual A that his associate was impatient and no longer willing to wait on Individual A and Individual B to get a letter of support from the alderman. In an attempt to alleviate the concerns of Individual A and Individual B that CW1 was not going to pay them for their efforts, on September 11, 2013, CW1 provided Individual B with $1,000 in FBI funds, which funds would be applied to the total $7,500 bribe payment given to the alderman.

32.    On October 1, 2013, at approximately 7:21 p.m., Individual B called Individual A. During that call, Individual B and Individual A continued to discuss obtaining the letter of support from Alderman A for the liquor license. Specifically, Individual B stated, "Yeah, I met with those guys today [believed to be referring to Alderman A's representatives, including THOMPSON, as explained below]." Individual B then told Individual A the situation in which he thinks he would be able to obtain a liquor license: "They said ok if he [CW1] wants to put through something similar to what a 7-Eleven is . . . so they have to do a store for the packaged goods like a 7-Eleven store . . . and they will give him a letter." Individual

B went on to explain why a 7-Eleven-type store would be granted a license: "He said the rationale is that it's, it's a, they already approved three other liquor stores. [...] So, but they will give us one if we come up with one designed like a 7-Eleven."

33.    On October 3, 2013 at approximately 7:48 p.m., Individual C called Individual B. During the call, Individual B informed Individual C that he met with Alderman A's representatives, believed to include THOMPSON, and that CW1 needed to obtain a rendering of the proposed store and make it a 7-Eleven-type store because of the number of liquor stores already present in Alderman A's ward.

34.    Specifically, Individual B said, "I went out there and talked to the guys [including THOMPSON] the other night, and uh. . . ." Individual C said, "Okay." Individual B continued, "And the guy told him, our guy [one of Alderman A's representatives] told him [THOMPSON] that I was the guy that he [one of Alderman A's representatives] had talked to him about. But they want the guy to have a, a, uh 7-Eleven kind of set up out there, and he'll [Alderman A] give us a letter [of support for a liquor license]. I don't know whether the guy's [CW1's associate] gonna go for the 7-Eleven set up, but that's what he's [Alderman A] requiring 'cause there's so many other places out there that's now doin' what they wanna do. You know you got Walmart, you got CVS, you got the, uh, uh, oh, the drug store, the other drug store beside CVS, Walgreen's, Walgreen's, something on 87th, and a few other places out there doin' the same thing. So it presents a problem for 'em. But if he [THOMPSON] said he [CW1's associate] set it up similar to what

13

that girl . . .did, he'll [Alderman A] go for it." Individual C said, "Th-that's [Alderman A's ward], right?" Individual B confirmed, Yeah."

35.    On October 7, 2013 at approximately 3:33 p.m., Individual B called telephone number (XXX) XXX-9301,[2] used by THOMPSON. During the call, Individual B mentioned that he met with THOMPSON last week regarding the packaged goods store. THOMPSON informed Individual B that Alderman A did not want another liquor store but would be open to a 7-Eleven-type store. THOMPSON also reminded Individual B that CW1 would be unable to get any permits for any type of store without Alderman A's approval.

36.    Specifically, Individual B said, "Curtis, this is [Individual B], I spoke to you last Tuesday about the packaged goods and the alderman suggested to [U/I]." THOMPSON said, "[U/I] meeting." Individual B said, "I was just wondering, could I bring the guy [CW1] who was going to be applying for the liquor license with a rendering of what the business is going to look like and hopefully you're ok before he can give him a letter [of support from the alderman]?" THOMPSON said, "Well, the reality is this: he [Alderman A] doesn't want another liquor store, period. So

---

[2] Telephone number (XXX) XXX-9301 is believed to be used by THOMPSON based on the following: (1) the context and content of the conversation between Individual B and THOMPSON, including Individual B identifying the user of telephone number (XXX) XXX-9301 as "Curtis"; (2) according to a public database, telephone number (XXX) XXX-9300 is the main telephone number of the 21st Ward Office of Alderman A, which suggests that (XXX) XXX-9301 is likewise a telephone number attributed to the same office; (3) the phone call was answered by an individual who stated, "Alderman [A's] office. How may I help you"; and (4) I have compared the voice of the user of telephone number (XXX) XXX-9301 with the voice of THOMPSON that was captured on an in-person audio recording with CW1 on October 9, 2013 and determined that the voice belongs to the same person.

that's why I said if you do like a 7-Eleven or a White Hen Pantry or something like that, he [Alderman A] would probably support it. But if you're going to do a liquor store, that's not gonna happen." Individual B said, "No, he's talking about a 7-Eleven-style store, and he's gonna bring a rendering of what it's going to look like to look at, so that he'll [Alderman A] know what it is that he's [CW1] going to do. As far as the per, permits and everything else, there's nothing there." THOMPSON said, "Well, you can't get any permits until he [Alderman A] approves it, so if he doesn't approve the facility, then you're wasting your money." Individual B said, "Ok." THOMPSON said, "So you can bring him in tomorrow. It doesn't matter who you bring." Individual B said, "Ok, so he just has to do the place first?" THOMPSON said, "Well no. First, he's gotta come in with the renderings and do the application for a uh, uh, food service center, well, actually, a 7-Eleven or something of a prototype that sells liquor." Individual B said, "Okay." THOMPSON said, "That has to be in your narrative to business license services." Individual B said, "Ok. I just want to make sure that I explained it to him [CW1] right before I come runnin' out, coming around, I don't want to waste your time, and I just want to be clear on it, ok?" THOMPSON said, 'No problem, sir." Individual B said, "Thank you very much [U/I]." THOMPSON said, "No problem."

37.     On October 8, 2013 at approximately 5:05 p.m., Individual C called Individual B. During the call, Individual C asked Individual B if he had CW1 with him because Alderman A's representatives wanted to talk to CW1. Individual C reassured Individual B that Alderman A's representatives would not cut Individual

B out of the deal if he brought CW1. Specifically, Individual C asked, "Do you have dude [CW1] with you?" Individual B said, "I didn't understand. What happened again?" Individual C repeated, "I said, do you have your friend [CW1] with you going that, going that route [to Alderman A's office]?" Individual B said, "Nah. Ain't nobody going with me." Individual C said, "No, no, no, no. You got a kid with you. They [Alderman A's representatives] want you to bring him, bring him with you. So they can see what, what the deal is. They said it ain't going to cost you [Individual B's fees], but bring him. They want to talk to him." Individual B said, "You, you, you talking about the guy [CW1] who want the package [liquor store/package store]?" Individual C said, "Yeah." Individual B said, "No, I left him out of the deal. I don't want him [U/I.]" Individual C said, "Hey, they ain't, they ain't going to do nothing but soft shoe you now. They ain't. I just talked with them. They ain't going to nothing but soft, soft shoe [explain that they are agreeable to the idea of the proposed store]. They said if you for real, bring him in and they, they, you know, they, they ain't going to cut you out [of the deal; from getting his payment from CW1]. They not going to cut you out." Individual B said, "Oh, okay. Alright. I'll bring him. I'll call him." Individual C said, "Alright." "

38.     Immediately after the above-described conversation with Individual C, at approximately 5:06 p.m., Individual B called CW1 and informed CW1, "I need to take you with me." CW1 agreed to pick up Individual B and drive down to the alderman's office together.

39.     At approximately 5:07 p.m., Individual B called Individual C.  During the call, Individual C informed Individual B that Alderman A's chief of staff, THOMPSON, will take care of it, meaning, obtaining Alderman A's support. Specifically, Individual B said, "Yeah, thanks for calling me back.  Let me [U/I].  I can get him to take me out there.  And he can explain the package and everything, and we'll get this done."  Individual C said, "There you go.  There you go." Individual B said, "Alright."  Individual C then said, "The chief of staff [THOMPSON], the chief of staff will take care of it."  Individual B said, "Alright." Individual C said, "Okay."  Individual B said, "Alright, I'll see him tonight."

40.     Prior to the meeting with Individual B, agents equipped CW1 with a concealed audio and video recording device.  CW1 then picked up Individual B and drove him to Alderman A's ward office, which is located on South Ashland Avenue, Chicago, Illinois.  According to CW1 and as confirmed by the recording, when CW1 and Individual B arrived, Alderman A was leaving and did not meet with CW1 and Individual B.  CW1 and Individual B then met with an unidentified female (UF). As captured on the audio record, UF said, "If you want to come back and meet with Curtis [THOMPSON], then I can schedule you."  They set up a meeting for the next morning.

### E.     October 9, 2013: Meeting with THOMPSON, Alderman A's chief of staff

41.     The next day, CW1 and Individual B returned to Alderman A's office. Prior to the meeting at Alderman A's office, the FBI equipped CW1 with a concealed audio and video recorder.  The FBI also provided CW1 with a note that stated,

"$7,500 to Ald for L.O.S [letter of support]." CW1 then proceeded to drive to Alderman A's ward office, which is located on South Ashland Avenue in Chicago, where he met Individual B.

42.    At approximately 10:45 a.m., while at Alderman A's office, Individual B received a call from Individual A. During the call, Individual B informed Individual A that they were waiting to meet with THOMPSON but that the alderman said okay, referring to the letter of support. Individual A then said that CW1 was then going to need to come with sixty-five hundred more, in reference to the additional $6,500 bribe payment that would be given in exchange for a letter of support. Specifically, Individual B answered, "[Individual B], west side. What's happenin'?" Individual A said, "[Individual B], what is happening?" Individual B said, "We're [Individual B and CW1] sitting here waiting." Individual A said, "He's [Alderman A] not there yet, huh?" Individual B said, "Yeah, he [Alderman A], he was here, [...]he should be back. His chief of staff [THOMPSON] is the one we're going to talk to, and he'll be back in a minute." Individual A asked, 'You bring him [Alderman A] the renderings yet?" Individual B said, "Yeah, they're here." Individual A asked, "What do you think?" Individual B said, "Well, we pretty. He the alderman [Alderman A] says okay." Individual A said, "Okay. Then [CW1] gotta come with sixty-five hundred more [bribe payment of $6,500]." Individual B said, "Yeah, well, just yah, just, need to have talk with chief of staff [THOMPSON]. 'Cause I was here to catch him this morning." Individual A said, "Okay, alright, so." Individual B said, "Soon as we're through, we'll, I'll get back to you."

18

43.     According to CW1 and as captured on the audio and video recording, CW1 and Individual B met with THOMPSON in a conference room inside Alderman A's ward office.  At the beginning of the meeting, THOMPSON provided CW1 with his business card, which CW1 later provided to the FBI.  According to the business card, THOMPSON is Alderman A's chief of staff.  According to the audio and video recording, THOMPSON then said, "The alderman [Alderman A] asked me to, uh, facilitate this meeting, um."  CW1 responded, "Appreciate that.  Thank you very much."

44.     According to the audio and video recording and CW1, THOMPSON looked at an artistic rendering of what the proposed packaged goods store would look like.  THOMPSON then asked, "Actually this is a prototype of a 7-Eleven or is it a brand name, a brand name?"  CW1 then said, "Uh, it would be, it wouldn't be called 7-Eleven, but uh, actually we have a rendering.  Do you have the rendering?"  THOMPSON responded, "I have the rendering right here."  THOMPSON continued, "'Cause he [Alderman A] had the idea to put a restaurant in there, and you're actually going to move into an area where he would prefer a restaurant."  THOMPSON explained, "Well, my biggest concern, and I'm not going to really advocate for this, but I will definitely give you a fair shake on it.  It's that, I'm really saturated with liquor in the ward, but I ain't the alderman you know, and my opinion will vary in certain decisions, but we're really heavily laden with liquor."

45.     THOMPSON explained further, "It's not for me to say yes or no actually.  I'll bring it to the alderman's [Alderman A's] attention.  I'll talk to the

committee, and in turn, I'll get you an audience, so you can pitch your program, and uh, we'll take it from there. That's the best I can do." CW1 responded, "We, we would really appreciate your support. We'd be willing to work with you on other stuff. Uh, also, also, I have a real estate background as well if we need to do something as far as some constituency or some other things you guys might need some help with. We'd like to work with you on that. I know these really can't be discussed. It's one issue at a time, but uh, just to keep some things in mind."

46. According to CW1 and as captured on the video recording, CW1 then showed THOMPSON the note, which said, "$7,500 to Ald for L.O.S."[3] As captured on the video recording, THOMPSON appeared to look down and read the note. THOMPSON then nodded his head affirmatively up and down and said, "Okay. I understand. I understand."

47. After discussing the location of the proposed packaged goods store, CW1 said, "So, we're really looking for your support on this." THOMPSON responded, "I understand, I understand. I will in turn bring it to the alderman [Alderman A] again, and I'll see what we can do. I'm going to actually have to speak to the community because we up for re-election, and we can't take a hit on this." CW1 then asked, "Uh, we'll work everything through Individual B?" THOMPSON

---

[3] The note was not visible on the video recording; however, the audio recording from the concealed body recorder captured the sound of CW1 unzipping a day organizer, which was provided by the FBI to CW1 and where the note from the FBI was placed prior to the meeting. Additionally, the FBI searched CW1 prior to the meeting and he had no other paper on his person outside of the note and day organizer provided by the FBI. Following the meeting with THOMPSON and Individual B, CW1 met with agents and returned the note and day organizer.

answered, "Okay." CW1 added, "As far as this goes and everything else that's necessary." THOMPSON responded, "Alright. Well, Individual B is your contact person. I'll talk to him more, than I'll talk to you anyway." CW1, Individual B, and THOMPSON then walked outside. CW1 then said, "We'll work with you." THOMPSON responded, "I appreciate that. Like I said, I'll get back to you. I tell you straight up where I'm at on this whole piece [Unintelligible]. I mean if not there. We'll try to find you someplace else where you can go. That's your premier location [Unintelligible]."

48. On October 18, 2013 at approximately 9:45 a.m., Individual B called THOMPSON, who was using telephone number (XXX) XXX-9301. During the call, Individual B asked THOMPSON if Alderman A had reached a decision on approving the liquor license for CW1. THOMPSON said that he was still working on it. Specifically, Individual B said, "Calling to see if you guys had reached a decision on [location of proposed liquor store]." THOMPSON said, "Not as of yet, but I'm working on it for you." Individual B said, "Okay." THOMPSON said, "You know what I mean? He hasn't said yes, one way or the other. The committee has been up in the air with it, so . . . and I been probing them to actually, you know, c'mon, get off the pot. So, I'll speak with him later today, and I can call you back, [Individual B]." Individual B said, "Thank you." THOMPSON said, "It might even be as early as Monday."

21

**F.    October 29, 2013: Meeting with Alderman A, THOMPSON, and an Unknown Male**

49.    On October 29, 2013, at the direction of the FBI, CW1 attended a meeting at Alderman A's ward office. Prior to the meeting, CW1 was equipped with concealed audio and video recording devices. The FBI also provided CW1 with a sheet of paper that showed a photograph of a liquor store at a different location than the one previously suggested by CW1.[4] At the bottom of the page and turned on its side was a yellow post-it note that said, "12K [$12,000] to you for letter of support[.]"

50.    CW1 met with Alderman A, THOMPSON, and an unknown male (UM). As captured on the audio/video recording, during the meeting, Alderman A informed CW1 that he was going to have difficulty supporting a liquor license in the location proposed by CW1 unless the store was going to be a name brand, such as a 7-Eleven or a White Hen, explaining that he would get his "teeth kicked in" by the community. Alderman A also explained that all liquor stores in the community would be upset if he supported a liquor license for CW1 because the other liquor store owners all support Alderman A "big time."

51.    In response, as captured on the audio and video recording and confirmed by CW1, CW1 explained that he had a proposal that would make everyone happy. CW1 unzipped his organizer, pulled out the sheet of paper containing the photograph and the post-it with the bribe offer, and handed it to

---

[4] Due to the concerns regarding the proposed location of the packaged goods store expressed by THOMPSON on behalf of Alderman A during the prior meeting, CW1, at the direction of law enforcement, suggested an alternate location for the proposed store.

Alderman A. As captured on the audio/video recording, Alderman A looked at the document and commented that he knew the location. The video recording then showed Alderman A turn his head slightly sideways while looking at the paper.

52. As captured on the recording, Alderman A then turned the page toward CW1, covering the portion with the post-it note with his hand. Alderman A then discussed the location further. Alderman A then handed the page to the UM, who appeared to look at the document and then turned the page sideways, as though to read the note. The UM then handed the sheet to THOMPSON. Alderman A informed CW1 that he would like to support him and would get back to him in a week or two with a decision.

53. Following the meeting, THOMPSON called Individual B and told him that CW1 needed to quit writing things down. Specifically, on October 31, 2013 at approximately 10:03 a.m., THOMPSON called Individual B. During the call, THOMPSON said, "Good morning, sir. This is Curtis from Alderman A's office. How you doin'?" Individual B said, "Ah, thank you, man. You took care of the business [obtaining Alderman A's approval for CW1's letter of support], you know, but uh, it ain't no big problem. I just didn't know, uh, 'cause I didn't get a chance to speak, and every time you called, I'd miss you call. And uh, so we're glad you got it together. Uh, so, he's [CW1] satisfied, with the, the thing you, you doing for him. Alright." THOMPSON said, "Sounds good."

54. Later in the call, Individual B said, "Thank you, sir, and I appreciate your call and taking care of the business, you know." THOMPSON said, "You're

welcome." Individual B then cautioned, "Keep an eye on that slick guy [CW1], though." THOMPSON said, "Ah, no doubt." Individual B said, "I didn't even want him to, I didn't even want him to talk to you guys, uh, 'til you guys, uh, asked me to. But we alright now, alright." THOMPSON said, "Yeah, and he needs to quit writing things down, too, you know." Individual B said, "Yeah, uh, uh, I know. I know you didn't appreciate that, but I didn't either." THOMPSON said, "Not at all. Not." Individual B said, "Because I had told him from the very beginning, 'listen, we're just making a presentation, no side bar, none of that stuff." THOMPSON said, "Exactly." Individual B said, "So that's. . .right, right." THOMPSON said, "Exactly." Individual B said, "So, we'll, we'll keep, we'll, we'll stay on top of him [CW1], and I'll come by, and we'll talk about your guy, alright." THOMPSON said, "Yeah, we'll talk in person, okay." Individual B said, "Alright. That's what I'm gonna do. Thank you."

### G. November 19, 2013: Meeting with Alderman A, THOMPSON, the UM, and an Unknown Female

55. On November 19, 2013, at the direction of the FBI, CW1 attended a meeting at Alderman A's ward office. Prior to the meeting, CW1 was equipped with concealed audio and video recording devices. Present for the meeting were Alderman A, THOMPSON, the UM, and an unknown female. As captured on the audio and video recording, after CW1 explained that he was going through the process of becoming a 7-Eleven franchisee, Alderman A expressed his support and willingness to send letters of support to 7-Eleven.

56.     As captured on the audio/video recording, CW1 asked Alderman A who he should go to "to hold up my end" and if he [Alderman A] was "good with the same arrangement" that CW1 talked about the last time.  THOMPSON then interjected, "That's a sidebar conversation."   The UM agreed, stating, "That's a side, side, sidebar conversation."  Alderman A shook his head a little and then told CW1 to let him know to whom to address the letter of support.  Alderman A agreed to send as many letters of support as CW1 needed.   CW1 said that he would go through THOMPSON.

57.     On November 21, 2013, CW1 picked up a letter of support to 7-Eleven Inc. from Alderman A's office.  This letter did not include any statements regarding Alderman A's support for the sale of alcohol.

**H.     Requests to CW1 for Donations from Alderman A's Office**

58.     On December 4 and 5, 2013, in recorded calls, CW1 left messages for THOMPSON at Alderman A's office.  On December 5, 2013, CW1 placed a recorded call to Alderman A's office and asked to speak with THOMPSON.   An unknown female informed CW1 that THOMPSON was unavailable.  As CW1 left his name for a message, the UF identified herself and said that THOMPSON had asked her to reach out to CW1 and to ask CW1 if he would make a donation to Alderman A's toy drive, which was part of Alderman A's Christmas party.  CW1 agreed to do so.

59.     On December 5, 2013, CW1 placed a recorded call to THOMPSON. During the call, CW1 informed THOMPSON that "in terms of progress, everything is going real good."   CW1 said, "I actually finished up the meeting with 7-Eleven

yesterday, the interview." THOMSPON responded, "Fantastic." CW1 then said, "So everything is moving along. Uh, you know, one thing they did ask about was the business model that we chose to proceed with, uh, and the letter that they wanted. I guess they wanted liquor or wines and spirits referenced on the letter." THOMPSON asked, "They want that expressed on the letter?" CW1 confirmed, "Yes, they want it, like, specifically worded on the letter, so. You know when I can pick a letter up with, uh, wine and spirits or, like, alcohol or liquor?" THOMPSON responded, "Uh, that's fine. Let me talk to the [U/I] . . . I'll need to reach out to him [Alderman A]. Tomorrow is Friday. Friday is not good. Can we shoot for Monday?" CW1 said, "Uh, yeah, that should be fine. Yeah, Monday should be fine." CW1 also said that he received the message from Alderman A's staff member regarding the fundraiser. CW1 confirmed that he would be at the fundraiser. THOMPSON said, "Ok, cool. That sounds good." THOMPSON then said, "Alright, I'll get back with you on Monday about the letter. We'll make the necessary adjustments."

60. On December 9, 2013, CW1 placed a recorded call to THOMPSON. During the call, THOMPSON informed CW1 that he was preparing for the alderman's Christmas party and the toy drive. THOMPSON informed CW1 that the letter [of support] was sitting there since they last spoke. CW1 and THOMPSON discussed the Christmas party and its location. CW1 then informed THOMPSON that CW1 also would eventually need a letter of support to the liquor commissioner, as well, but they could talk about it another time.

61.  On December 10, 2013, at the direction of the FBI, CW1 went to Alderman A's office to pick up the letter of support. CW1 was equipped with concealed audio and video recording devices. While inside Alderman A's office, CW1 briefly met with THOMPSON. During the meeting, CW1 asked THOMPSON, "How you doin', Curtis?" THOMPSON responded, "I understand you want to help out the alderman." THOMPSON explained that they don't do "impropriety" sort of things, but he requested that CW1 co-sponsor Alderman A's Christmas party for $750. THOMPSON handed CW1 a flyer for the Christmas party. THOMPSON explained, "It would be a good thing." CW1 agreed to co-sponsor the party.

62.  The letter of support to 7-Eleven Inc., which appeared on the letterhead of Alderman A, was signed in the name of Alderman A. The letter stated, in part, "Please allow this letter to serve as my full support for a 7-Eleven convenience store to be operated out of the location [at a particular address], Chicago, Illinois. This store will be a welcomed addition to [Alderman A's ward] community and those that patronize the area for their shopping and convenience needs. As well as wines and spirits (alcohol)." The letter also stated, "If you have any questions or require additional information please feel free to contact me or my Chief of Staff, Curtis V. Thompson, Jr. . . ."

63.  On December 11, 2013, CW1 placed another recorded call to THOMPSON. CW1 said that he spoke to his guy and would be good with sponsoring the alderman's Christmas party. CW1 and THOMPSON agreed to meet up the next day.

**I.     December 12, 2013: Meeting with THOMPSON**

64.     On December 12, 2013, CW1 met with THOMPSON at the location where Alderman A was holding his Christmas party.  CW1 was equipped with a concealed audio and video recorder.  During the meeting, CW1 and THOMPSON stepped out of the room where other people were located.   CW1 said that he didn't want to have a conversation in the office.  CW1 told THOMPSON, "Just wanted to let you know that the letter worked perfect. The 7-Eleven is moving forward.  I'm a man of my word.  You don't have to worry about the $7500 we talked about.  I'll take care of that however you want, whatever you want."  THOMPSON responded, "Don't worry about that.  Just keep your business in the area and do what you do.  Support the Christmas party.  And as we have fundraisers, just show up and support the fundraisers."  CW1 said, "Oh yeah, sure, that's the best way.  I'd rather not deal directly with the alderman. . . . [Individual B] told me to make sure that things were taken care of on that end. . . I'm not looking at this as a short term relationship."  THOMPSON explained, "You have to really realize the fact that we are definitely concerned.  There's a lot of witch hunting going on and we don't know . . . ."  CW1 said that he didn't want to have "that conversation in front of the alderman," referring to the last in–person meeting with Alderman A in which he offered the $12,000 bribe to Alderman A on the post-it note.  THOMPSON said, "And you came on strong with that, and everybody got nervous, is what I'm saying.  And that's why I tabled it."  CW1 said that he was not trying to have that conversation directly with the alderman and said, "If you want, as far as the 75

[$7,500], I can do that on the side with anybody else, you know what I mean? Just let me know when, and I'll take care of it." THOMPSON replied, "Alright, alright."

65.     CW1 then asked if it was cash or a check, referring to the payment for the Christmas party. THOMPSON said that if it was cash, he [referring to the owner of the party venue] could write CW1 a receipt. CW1 said that he could swing back tomorrow [with the money]. THOMPSON told CW1 to let him [the owner of the party venue] write up the contract and that he would put CW1 on the contract, explaining, "Then you deliver the 750." CW1 referenced Individual B saying, "My reputation is good as gold." THOMPSON said, "I'm not going to go there." CW1 said, "In terms of whatever you want, I can take care of that. Just let me know." THOMPSON said, "Alright." CW1 asked if he would want "that done" before the party. THOMPSON said, "We're going to have a fundraiser in January. Just show up then. Then maybe you might want to be one of the premier sponsors of that, too. But we'll talk about that."

66.     As they walked outside, CW1 told THOMPSON that he wanted to budget because he has a partner that he has to answer to on figures and that his partner didn't think he was taking money. THOMPSON said, "However you do it on your business, however you do it. I don't want you to call me tomorrow and say your guy didn't show up." CW1 said, "You have at least that 7500 coming, whichever way you want it." THOMPSON said, "I don't hear anything, but I got you. We're cool."

29

67.     The following day, December 13, 2013, CW1 left a recorded voicemail message for THOMPSON, stating that CW1 would be dropping off the sponsorship check to the owner of the Christmas party venue. Later in the day, CW1 spoke with THOMPSON in a recorded call. During the call, THOMPSON said that the owner of the Christmas party venue had called him twice to verify that CW1 was bringing him a check. THOMPSON told CW1 that he had told the owner that CW1 keeps his "word." THOMPSON then told CW1, "Thanks again for your support."

**J.      December 19, 2013: THOMPSON accepts $7,500 Bribe**

68.     On December 19, 2013, CW1 attended Alderman A's Christmas party. Prior to attending the party, CW1 was equipped with a concealed audio and video recorder. FBI agents also searched CW1 and CW1's vehicle for any money. CW1 was found to have $169 on his person and no additional money in his vehicle.[5] Agents handed CW1 a red envelope containing a Christmas card and seventy-five $100 bills. CW1 then attended Alderman A's Christmas party.

69.     As captured on the audio/video recording and according to CW1, as CW1 was leaving the party, CW1 asked THOMPSON to walk him out, which THOMPSON agreed to do. While outside, as captured on the audio/video recording, CW1 said to THOMPSON, "I brought you a little something." According to CW1, CW1 then handed the red envelope to THOMPSON. According to CW1, when THOMPSON received the envelope, he felt it deliberately, looked at it, and then put

---

[5] CW1 met with FBI agents following the Christmas party. Agents searched CW1 and his vehicle, and CW1 was found to have $140 on his person and no additional money in his vehicle. CW1 explained that he bought four non-alcoholic drinks at the party that cost $29, which included tips.

it inside his jacket pocket. As captured on the audio/video recording, THOMPSON said, "Thanks." CW1 said, "Happy holidays. Have a great weekend, brother." THOMPSON replied, "Thank you. I really appreciate you, brother. I got you back." THOMPSON then said, "I do all the work with little acknowledgment, so I don't know how long I'm gonna be around."

## III.    CONCLUSION

70.    Based on the foregoing, I submit that there is probable cause to believe that CURTIS V. THOMPSON, JR., an agent of the City of Chicago, a local government receiving in excess of $10,000 under a Federal program from January 1, 2013 to December 31, 2013, and as a staff member of Alderman A, corruptly solicited, accepted, and agreed to accept things of value, namely $7,500, intending to be influenced and rewarded in connection with any business, transaction, and series of transactions of the City of Chicago, specifically, a letter of support from Alderman A for the sale of alcohol in a business to be established and licensed in Alderman A's ward, which involved a value of $5,000 or more, in violation of 18 U.S.C. § 666(a)(1)(B).

FURTHER AFFIANT SAYETH NOT.

RAYMOND B. HART
Special Agent, Federal Bureau of
Investigation

SUBSCRIBED AND SWORN to before me on February 26, 2014.

JEFFREY COLE
United States Magistrate Judge

32